NMA/MGD:PJC/KA
F. #2023R00592

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

ZHANG HUANG,
also known as "Danny Huang,"
YANLE HUANG,
also known as "Logan Wong,"
JIAN XIN HUANG and
XIUQIN HUANG,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

COMPLAINT AND AFFIDAVIT IN SUPPORT OF APPLICATION FOR ARREST WARRANTS

Cr. No. 26 MJ 183

(T. 18, U.S.C., § 371)

EASTERN DISTRICT OF NEW YORK, SS:

LU TSZYAN-DAI, being duly sworn, deposes and states that she is a Special Agent with the United States Department of Health and Human Services, Office of Inspector General ("HHS-OIG"), duly appointed according to law and acting as such.

In or about and between September 2020 and March 2026, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ZHANG HUANG, also known as "Danny Huang," YANLE HUANG, also known as "Logan Wong," JIAN XIN HUANG, and XIUQIN HUANG, together with others, did knowingly and willfully conspire to offer and pay any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to one or more persons to induce such persons to purchase, lease and order any goods, facilities, services and items for which payment may have been made in whole and in part under Medicare, Medicare Advantage, Medicaid and Medicaid

Managed Care Plans, which are each a federal health care program, contrary to Title 42, United States Code, Section 1320a-7b(b)(2)(B).

In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants ZHANG HUANG, YANLE HUANG, JIAN XIN HUANG, and XIUQIN HUANG, together with others, committed and caused the commission of, among others, at least one of the following:

OVERT ACTS

(a) On or about October 5, 2022, YANLE HUANG messaged ZHANG HUANG, "Send me their card through wechat we will swipe here and u just give them the apple."

(b) On or about October 5, 2022, ZHANG HUANG messaged YANLE HUANG, "The [patient] came and said other place are 20 apples we only give out 15 apples."

(c) On or about October 5, 2022, YANLE HUANG messaged ZHANG HUANG, "Tell him [one healthcare plan] we give 20 apple [a second healthcare plan] 15 apple [a third healthcare plan] 10 if they do not join any medicare plan (like those above) it is 50 apple."

(d) On or about May 8, 2023, JIAN XIN HUANG messaged YANLE HUANG, sending a photograph of a check made out from 168 DME Inc. to [a local supermarket] for $2,000, dated May 6, 2023.

(e) On or about July 31, 2025, ZHANG HUANG directed Confidential Source-1 to seek prescriptions to be filled at QS Pharmacy in exchange for kickback payments.

(f) On or about March 24, 2026, JIAN XIN HUANG delivered an over-the-counter card reader to ROK Pharmacy.

(g) On or about March 24, 2026, XIUQIN HUANG assisted and directed an employee of ROK Pharmacy to process over-the-counter cards for customers who were not physically present at ROK Pharmacy.

(h) On or about March 24, 2026, XIUQIN HUANG prepared envelopes containing kickback payments for delivery to customers of ROK Pharmacy.

The source of your deponent's information and the grounds for her belief are as follows:

1. I have been a Special Agent with HHS-OIG for approximately four years. As an HHS-OIG Special Agent, I primarily investigate health care violations, including schemes to defraud the Medicare and Medicaid programs and other health care benefit programs. During my tenure with HHS-OIG, I have participated in a variety of criminal health care fraud investigations, during the course of which I have interviewed witnesses, conducted physical surveillance, arranged consensually-monitored telephone calls and video recordings, executed search warrants, including for electronic evidence, and reviewed health care claims data, bank records, telephone records, medical records, invoices and other business records. I am familiar with the records and documents maintained by health care providers and the laws and regulations related to the administration of the Medicare and Medicaid programs and other health care benefit programs.

2. I have personally participated in the investigation of the offense discussed below. I am familiar with the facts and circumstances of this investigation from, among other things: (a) my personal participation in this investigation, (b) reports made to me by other law enforcement authorities and (c) information obtained from witnesses.

3. Except as expressly set forth herein, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I have hearsay knowledge.

Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a complaint and for the issuance of arrest warrants, I have not set forth each and every fact learned during the course of this investigation. Instead, I have set forth only those facts, in sum and substance and in part, which I believe are necessary to establish probable cause in support of a complaint and for the issuance of the arrest warrants.

## PROBABLE CAUSE

At all times relevant to this application, unless otherwise stated:

### Medicare and Medicaid

4. Medicare is a federal health care program that provided benefits to persons who were at least 65 years old or disabled. Medicare is administered by the Centers for Medicare and Medicare Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."

5. Medicare is divided into multiple parts. Medicare Part A covers health services provided by hospitals, skilled nursing facilities, hospices and home health agencies. Medicare Part B covers outpatient hospital services and professional services provided by physicians and other providers. Medicare Part C—also known as Medicare Advantage—offers beneficiaries the opportunity to secure coverage from private insurers for many of the same services that are provided under Parts A and B, in addition to certain mandatory and optional supplemental benefits. Medicare Part D provides prescription drug coverage to persons who are eligible for Medicare.

6. Medicaid is a federal and state health care program that provides benefits to individuals and families who meet specified financial and other eligibility requirements, and

certain other individuals who lack adequate resources to pay for medical care. CMS is responsible for overseeing Medicaid in participating states, including New York. Individuals who receive benefits under Medicaid are referred to as "recipients."

7. Medicaid covers the costs of medical services and products ranging from routine preventive medical care for children to institutional care for the elderly and disabled. In New York, Medicaid provides coverage to its recipients for prescription drugs. Medicaid recipients can obtain their prescription drug benefits from pharmacies either through "fee-for-service" enrollment or through Medicaid Managed Care plans, which are administered by private insurance companies that are paid by Medicaid.

8. As part of their insurance benefits, some Medicare beneficiaries and Medicaid recipients receive a certain amount of credit per month that can be spent on eligible over-the-counter ("OTC") non-prescription items such as analgesics, diabetes supplies, antihistamines, weight management supplies, sleep aids, vitamins, toothpaste, durable medical equipment and other products. OTC credit cannot be spent on items such as cosmetics, hair care products, dry-skin lotions and perfumes. The monthly OTC credit is pre-loaded onto debit cards known as "over-the-counter cards" or "OTC Cards," which are issued to beneficiaries and recipients. Any funds that are not used by the end of a plan-defined period are forfeited, and the OTC Cards are reloaded each month with refreshed funds. Pharmacies generally dispense OTC products to Medicare beneficiaries and Medicaid recipients by swiping the OTC Cards through an electronic payment system that debits the cost of approved OTC products.

9. Medicare, Medicare Advantage, Medicaid and Medicaid Managed Care plans (collectively the "Plans") were "health care benefit programs," as defined by Title 18, United

States Code, Section 24(b), and "Federal health care programs," as defined in Title 42, United States Code, Section 1320a-7b(f).

10. To submit a claim for payment to Medicaid, pharmacies are required to maintain a standing certification, which applies to all claims submitted electronically or on paper using the pharmacy's National Provider Identifier ("NPI") or Medicaid provider identification number. The standing certification attests, inter alia, that

> All statements, data and information are true, accurate and complete to the best of my knowledge; no material fact has been omitted; I understand that payment and satisfaction of this claim will be from federal, state and local public funds and that I may be fined and/or prosecuted under applicable federal and state laws for any violation of the terms of this certification, including but not limited to false claims, statements or documents, or concealment of a material fact….

11. A pharmacy can participate in Medicare Part D by entering into a retail network agreement: (a) directly with a Part D Plan; (b) with one or more Pharmacy Benefit Managers ("PBMs"); or (c) with a Pharmacy Services Administration Organization ("PSAO"). A PBM acts on behalf of one or more Part D Plans. Through a Part D Plan's PBM, a pharmacy can join a Part D Plan network. A PSAO contracts with PBMs on behalf of the pharmacy.

12. Typically, a Medicare beneficiary enrolled in a Part D Plan obtains prescription medications from a pharmacy authorized by the beneficiary's Part D Plan. After filling a beneficiary's prescription, the authorized pharmacy submits the claim either directly to a Part D Plan or to a PBM that represents the Part D Plan. The pharmacy provides the beneficiary's identification number as well as the pharmacy's NPI with the claim. The Part D Plan or the PBM determines whether the pharmacy is entitled to payment for each claim. Then, the Part D Plan or PBM, either directly or through a PSAO, reimburses the pharmacy for the claim.

<u>The Defendants and Relevant Entities and Individual</u>

13. The defendant ZHANG HUANG, also known as "Danny Huang," is an accountant, United States Internal Revenue Service ("IRS") enrolled agent and tax return preparer and is and was the beneficial owner of multiple pharmacies in Queens, New York, including 168 DME Inc., doing business as 168 Pharmacy ("168 DME"), 169 DME Inc., doing business as 169 Pharmacy ("169 DME"), QS Pharmacy Inc. ("QS Pharmacy"), ROK Pharmacy Inc. ("ROK Pharmacy") and 19 Pharmacy Corp. ("19 Pharmacy") (together, 168 DME, 169 DME, QS Pharmacy, ROK Pharmacy, and 19 Pharmacy are the "Pharmacies"). ZHANG HUANG is also the owner of 88 Accounting Corp. and 88 Accounting & Tax Inc. (together, "88 Accounting").

14. The defendant YANLE HUANG, also known as "Logan Wong," is the sister of ZHANG HUANG. YANLE HUANG was the owner of 168 DME, a beneficial owner of QS Pharmacy and a licensed pharmacist. YANLE HUANG also recruited multiple pharmacists and other employees to work in the Pharmacies. YANLE HUANG left the United States in approximately March 2026, and has not returned.

15. The defendant JIAN XIN HUANG is the father of the defendants ZHANG HUANG and YANLE HUANG. JIAN XIN HUANG worked at QS Pharmacy, 19 Pharmacy, 169 DME, and ROK Pharmacy.

16. The defendant XIUQIN HUANG is the mother of the defendants ZHANG HUANG and YANLE HUANG. XIUQIN HUANG was the manager of ROK Pharmacy.

17. 168 DME was a retail pharmacy located in Flushing, New York, that operated between approximately September 2020 and December 2023.

18. 169 DME was a retail pharmacy located in Flushing, New York, that operated between approximately May 2022 and April 2025.

19. QS Pharmacy was a retail pharmacy located in Flushing, New York, that began operating in approximately October 2023.

20. 19 Pharmacy was a retail pharmacy located in Flushing, New York, that began operating in approximately October 2023.

21. ROK Pharmacy was a retail pharmacy located in Flushing, New York, that began operating in approximately January 2024. ROK Pharmacy occupied the same physical space previously occupied by 168 DME.

The Health Care Fraud and Kickback Scheme

22. In or about and between September 2020 and March 2026, the defendants ZHANG HUANG, YANLE HUANG, JIAN XIN HUANG and XIUQIN HUANG and their co-conspirators conspired to execute and executed a scheme whereby they (i) submitted or caused to be submitted claims to the Plans for the dispensing of pharmaceutical and OTC products that were medically unnecessary, not actually provided, and/or induced by the payment of illegal kickbacks and bribes, and (ii) paid illegal kickbacks and bribes in furtherance of the health care fraud scheme.

23. The defendants ZHANG HUANG, YANLE HUANG, JIAN XIN HUANG, and XIUQIN HUANG had varied roles in the scheme. Based my review of financial records, I am aware that the defendant ZHANG HUANG was a beneficial owner of the Pharmacies and the owner of 88 Accounting. Based on interviews with employees of the Pharmacies, I am aware that ZHANG HUANG trained employees at QS Pharmacy as to how to the kickback scheme worked, including how to swipe OTC Cards and to provide cash to Medicare beneficiaries and Medicaid recipients instead of eligible OTC items. As discussed further below, ZHANG HUANG also

instructed Confidential Source-1,[1] an individual whose identity is known to me, as to how he/she could obtain "benefits," i.e. kickbacks and bribes, from the Pharmacies in exchange for obtaining and filling expensive and medically-unnecessary prescriptions at the Pharmacies.

24. Based on interviews with employees of the Pharmacies, I am aware that the defendant YANLE HUANG owned ROK Pharmacy and hired several of the Pharmacies' employees. These employees have also informed law enforcement that YANLE HUANG worked as a pharmacist at QS Pharmacy and instructed QS Pharmacy employees on the operation of the kickback scheme, including deciding which customers were eligible to receive illegal kickbacks.

25. Based on interviews with employees of the Pharmacies, I am aware that the defendant JIAN XIN HUANG trained 169 DME employees on the kickback scheme, brought envelopes containing kickback payments to 169 DME, and instructed 169 DME employees on how to distribute kickbacks to pharmacy customers. As discussed further below, JIAN XIN HUANG also personally paid kickbacks and bribes to customers at QS Pharmacy.

26. Based on interviews with employees of the Pharmacies and surveillance, I am aware that XIUQIN HUANG managed ROK Pharmacy and provided guidance on the operation of the bribe and kickback scheme.

27. In or about and between September 2020 and March 2026, Medicare paid the Pharmacies over $55 million for prescription medications that were not medically necessary and/or were induced by the payment of illegal kickbacks and bribes.

[1] Confidential Source-1 was a Medicare beneficiary and Medicaid recipient. Confidential Source-1 is financially compensated for the information he/she provides to the government. His/her information has proven reliable and has been corroborated by other evidence in the investigation, including by documents and information provided by other witnesses as described further herein.

Text Messages Related to the Scheme

28. On March 27, 2026, the Hon. James R. Cho, United States Magistrate Judge, authorized a search of QS Pharmacy, 19 Pharmacy, ROK Pharmacy and 88 Accounting. See No. 26-MC-1244 (the "Premises Warrant"). Pursuant to the Premises Warrant, law enforcement obtained English language text messages between the defendants ZHANG HUANG and YANLE HUANG. Text messages obtained pursuant to the Premises Warrant show that ZHANG HUANG and YANLE HUANG discussed the kickback scheme, the amount of the kickbacks to be paid to customers—which they referred to in code as "apple"—OTC Cards used to pay kickbacks and the involvement of the defendant XIUQIN HUANG in the scheme, who they referred to as "mom."

29. For example, on or about August 2, 2021, the defendant YANLE HUANG discussed with the defendant ZHANG HUANG providing office space for a doctor who provides prescriptions to customers of the Pharmacies. YANLE HUANG wrote, "I think it is ok that we provide a temporary office. The doctor gets patient and we gets [sic] prescription [sic]. But mom think the foot doctor should get his own office building."

30. On or about October 5, 2022, the defendants YANLE HUANG and ZHANG HUANG discussed kickback payments using the code word "apple." YANLE HUANG wrote, "Send me their card through wechat we will swipe here and u just give them the apple." Based on my training and experience and involvement in this investigation, I understand YANLE HUANG to be referring to OTC Cards used to pay cash kickbacks to customers of the Pharmacies.

31. On or about December 11, 2022, the defendants YANLE HUANG and ZHANG HUANG discussed the defendant XIUQIN HUANG's concern about paying cash kickbacks. YANLE HUANG wrote, "So basically mom is very scared now. She does not want

apple in [bank name]." YANLE HUANG then asked, "Is there apple already in 19 Corp.?" I am aware that these messages were sent three days after law enforcement arrested two defendants for paying kickbacks and bribes to customers at their pharmacies in Flushing, New York. I am also aware based on my review of text messages between YANLE HUANG and the defendant ZHANG HUANG that they frequently discussed law enforcement activities in the health care industry, including indictments.

32. The defendant XIUQIN HUANG also discussed with a pharmacy employee by text message her participation in the kickback scheme.[2] On approximately August 21, 2023, XIUQIN HUANG wrote, "Exactly, it should be like this. This month, have to open on Saturday, there's a lot to give out on Saturday." Based on my training and experience and involvement in this investigation, I understand XIUQIN HUANG to be referring to plans to pay a large number of bribes and kickbacks.

<u>Kickbacks Paid to Confidential Source-1</u>

33. As a part of this investigation, between approximately July 2025 and January 2026, Confidential Source-1 visited 169 DME, QS Pharmacy, and 19 Pharmacy. As described further below, during these visits, defendants ZHANG HUANG and JIAN XIN HUANG and employees at the Pharmacies directed Confidential Source-1 to obtain prescription medications that could be filled at their pharmacies in exchange for illegal kickbacks and bribes in the form of supermarket gift certificates and cash payouts from Confidential Source-1's OTC benefits. Confidential Source-1 was provided distinctive pieces of colored paper with unique markings used to track kickbacks owed to Confidential Source-1. I am aware, based on my

[2] These conversations occurred in Mandarin and have been translated to English by an individual who is fluent in Mandarin and English.

training and experience, that health care businesses engaged in paying illegal kickbacks and bribes often use similar methods to track their kickback payments and to prevent beneficiaries from presenting false claims for kickbacks or claiming that they have not been paid kickbacks owed to them.

34. In total, between approximately July 2025 and January 2026, employees at QS Pharmacy paid Confidential Source-1 at least $356 in cash and supermarket gift certificates in exchange for filling prescriptions at QS Pharmacy and for using Confidential Source-1's OTC Card at QS Pharmacy. These interactions were audio and video recorded by Confidential Source-1. They occurred in Mandarin, and they have been translated by an individual who is fluent in Mandarin and English.

35. On or about July 31, 2025, Confidential Source-1 attempted to fill prescriptions at 169 DME, but it was closed. Confidential Source-1 then went to QS Pharmacy where Confidential Source-1 was directed by the defendant ZHANG HUANG to a medical office one floor below QS Pharmacy to obtain prescriptions. At that medical office, Confidential Source-1 briefly saw a doctor through a window and received two prescriptions, which Confidential Source-1 brought to QS Pharmacy. Confidential Source-1 asked ZHANG HUANG about the benefits of using QS Pharmacy to fill prescriptions, and ZHANG HUANG told Confidential Source-1 in a hushed voice, in sum and substance, that QS Pharmacy would provide Confidential Source-1 with supermarket gift certificates in exchange for filling prescriptions at the pharmacy and that the value of these kickbacks would depend on which prescription medications were filled. A QS Pharmacy employee, in the presence of ZHANG HUANG, informed Confidential Source-1 that QS Pharmacy would pay $4 per medication in kickbacks and that Confidential Source-1 needed to accumulate $100 in owed kickbacks or "tickets" before the

pharmacy would pay Confidential Source-1. The employee, again in the presence of ZHANG HUANG, then gave Confidential Source-1 a piece of orange-colored paper or "ticket" with a distinctive stamp and hole punch to reflect the kickbacks owed to Confidential Source-1.

36. On or about August 22, 2025, Confidential Source-1 returned to QS Pharmacy and witnessed two individuals exchanging with the defendant JIAN XIN HUANG orange paper tickets, similar to those provided to Confidential Source-1, for what appeared to be envelopes containing supermarket gift certificates. When Confidential Source-1 asked an employee at QS Pharmacy how to get more tickets for supermarket gift certificates, the employee informed Confidential Source-1, in sum and substance, that they needed to get more prescriptions. To suggest a medication that could be prescribed and filled at the pharmacy, the employee asked Confidential Source-1 whether Confidential Source-1 was more bothered by an itch or by pain, to which Confidential Source-1 responded he/she actually has no pain or itchiness, indicating a lack of medical necessity for additional prescriptions. The employee nonetheless instructed Confidential Source-1 to ask a doctor for a prescription for hydrocortisone, an itch-relieving cream.




Fig. 1. Photograph of the defendant JIAN XIN HUANG holding an orange ticket similar to that given to Confidential Source-1.

37. On or about September 4, 2025, Confidential Source-1 again saw a doctor in the medical office below QS Pharmacy. The visit lasted less than approximately one minute, and the doctor prescribed an expensive pain patch, Diclofenac Epolamine. I know from my training and experience that Diclofenac Epolamine is a common target of pharmacy fraud schemes because insurance reimburses pharmacies significant amounts for dispensing it.

38. On or about September 11, 2025, Confidential Source-1 returned to QS Pharmacy to pick up the Diclofenac Epolamine pain patches. Confidential Source-1 informed an employee at the pharmacy that he/she did not intend to use the pain patches, offered to trade the pain patches for something else and offered to gift the pain patches back to the pharmacy, again suggesting a lack of medical necessity. The pharmacy employee told Confidential Source-1, in sum and substance, that he/she had to take the medication with him/her and that Confidential

Source-1 could give the medication to friends. The employee at QS Pharmacy also provided Confidential Source-1 with another orange paper ticket reflecting that Confidential Source-1 had earned $20 in kickback value for filling the Diclofenac Epolamine prescription at the pharmacy.

39. On or about September 25, 2025, Confidential Source-1 picked up three additional prescriptions at QS Pharmacy and was provided additional orange paper tickets reflecting that Confidential Source-1 had earned $12 in kickback value for filling the prescriptions at the pharmacy.

40. On or about October 8, 2025, Confidential Source-1 visited QS Pharmacy and was informed that he/she could schedule a pickup for "money" since he/she had a Diclofenac Epolamine prescription on file.

41. On or about October 15, 2025, Confidential Source-1 visited QS Pharmacy and arranged to pick-up cash in exchange for Confidential Source-1's OTC Card benefits and also received additional orange paper tickets reflecting that Confidential Source-1 had had earned $40 in additional kickback value for picking up Diclofenac Epolamine patches.

42. On or about October 23, 2025, Confidential Source-1 returned to QS Pharmacy. Confidential Source-1 received approximately $120 in cash in exchange for Confidential Source-1's OTC Card benefits and approximately $40 worth of supermarket gift certificates for his/her Diclofenac Epolamine prescriptions.

43. On or about October 30, 2025, Confidential Source-1 returned to QS Pharmacy where he/she received approximately seven prescription drugs and was provided an orange paper ticket indicating that he/she had accrued an additional approximately $28 in kickback value, or four dollars in value per medication dispensed.

44. On or about November 17, 2025, Confidential Source-1 returned to QS Pharmacy. At that point, Confidential Source-1 did not have any refills, so he/she returned to the medical office below QS Pharmacy and received a new prescription for Diclofenac Epolamine patches. For this prescription, Confidential Source-1 received from a QS Pharmacy employee an orange paper ticket worth approximately $20 in kickback value. Unprompted, the employee told Confidential Source-1 to bring his/her OTC Card next time he/she came to QS Pharmacy.

45. On or about November 20, 2025, Confidential Source-1 returned to QS Pharmacy and gave his/her OTC Card to an employee who told him/her that he/she did not have to earn $100 in value before receiving a kickback if he/she was also redeeming an OTC card. I am aware, based on my training and experience, that this employee appears to be offering a quid pro quo in that, if a patient is filling Diclofenac Epolamine prescriptions at QS Pharmacy, they can redeem the cash value of their OTC card prior to reaching $100 in value based on filled prescriptions.

46. On or about November 24, 2025, Confidential Source-1 returned to QS Pharmacy and was given approximately $120 in cash in exchange for the benefits on his/her OTC Card. JIAN XIN HUANG was at QS Pharmacy at the time.

47. On or about December 18, 2025, Confidential Source-1 returned to QS Pharmacy to drop off his/her OTC Card and was given two refilled prescriptions and additional Diclofenac Epolamine patches. Confidential Source-1's prior Diclofenac Epolamine patch prescription did not authorize refills, Confidential Source-1 did not request refills from QS Pharmacy, and Confidential Source-1 did not meet with a medical provider to obtain authorization for refills. The dispensed Diclofenac Epolamine patches indicated that they were dispensed on approximately December 9, 2025, by one of the providers Confidential Source-1 previously saw

in the office below QS Pharmacy, suggesting that the provider re-prescribed Diclofenac Epolamine for Confidential Source-1 without his/her knowledge and without a subsequent medical visit.

48. On or about December 26, 2025, Confidential Source-1 returned to QS Pharmacy to pick-up cash in exchange for his/her OTC Card benefits. Employees refused to exchange Confidential Source-1's OTC Card benefits for cash without orange paper tickets. While at QS Pharmacy, Confidential Source-1 observed other customers receiving orange paper tickets with their prescriptions and overheard other customers complaining to employees in sum and substance that QS Pharmacy did not stock or dispense low-cost drugs and was changing the rules. Based on my training and experience and knowledge of the investigation, I believe that these conversations relate to QS Pharmacy changing its practice with respect to paying kickbacks and bribes, in particular because Confidential Source-1 had previously been told by employees that he/she could redeem his/her OTC Card benefits for cash without accruing $100 in kickback value if he/she had a Diclofenac Epolamine prescription on file with the pharmacy.

49. On or about December 30, 2025, Confidential Source-1 returned to QS Pharmacy and received approximately $120 in cash in exchange for his/her OTC Card benefits and approximately $16 in supermarket gift certificates for prescriptions he/she picked up from QS Pharmacy. Confidential Source-1 also took back possession of his/her OTC Card, which had been kept at the pharmacy. I am aware, based on my training and experience, that OTC Cards when used legitimately are typically kept in the possession of the beneficiary so that they can use the card to make legitimate transactions. By contrast, pharmacies engaged in illegal kickback schemes often keep possession of OTC Cards because swiping numerous transactions to reach the cash equivalent of the benefits on the card is time consuming.

50. On or about January 21, 2026, Confidential Source-1 again returned to QS Pharmacy. He/she attempted to redeem kickback value accumulated on his/her orange paper tickets, but employees refused to do so since he/she had no refills on his/her prescriptions. Confidential Source-1 then went to the medical office below QS Pharmacy and received another prescription for Diclofenac Epolamine patches to be filled at QS Pharmacy. QS Pharmacy employees then offered Confidential Source-1 a choice among three supermarkets for which QS Pharmacy could provide supermarket gift certificates for an accumulated kickback value of approximately $116. The employee then scheduled Confidential Source-1 to pick up the gift certificates on approximately January 28, 2026.

51. On or about January 28, 2026, Confidential Source-1 returned to QS Pharmacy and received approximately $116 in supermarket gift certificates, which were pre-prepared. While at QS Pharmacy, an employee discussed with Confidential Source-1 switching to another insurance plan, recommending a specific insurance plan by name. When Confidential Source-1 inquired whether it was "good" insurance, the employee explained, in sum and substance, that it was not necessarily good, but it reimbursed for a lot of medications.

52. Medicare prescription drug event data shows that, on approximately February 6 and 11, 2026, QS Pharmacy purported to dispense prescription medications to Confidential Source-1, which Confidential Source-1 did not request or pick up. On approximately March 11, 2026, Confidential Source-1 attempted to visit QS Pharmacy, but the door to QS Pharmacy was closed and locked with the lights off. The next day, law enforcement observed an employee from QS Pharmacy at ROK Pharmacy with the defendant XIUQIN HUANG.

53. On approximately March 12, 2026, Confidential Source-1 went to 19 Pharmacy and attempted to fill his/her prescriptions. An employee told Confidential Source-1 that 19 Pharmacy was not accepting new patients and offered, unsolicited, that there were no "benefits" for new customers. When Confidential Source-1 inquired if current customers received benefits, the employee explained that some did and some did not. As discussed above, I am aware based on my training and experience and involvement in this investigation, that "benefits" in this context refers to kickbacks and bribes for filling prescriptions.

<u>The Premises Search and Resulting Interview</u>

54. Law enforcement executed a search of QS Pharmacy, 19 Pharmacy, ROK Pharmacy and 88 Accounting pursuant to the Premises Warrant on March 31, 2026. From 88 Accounting, law enforcement recovered approximately $300,000 in cash and orange-colored paper matching the tickets given to Confidential Source-1, and observed a paper cutting machine and envelopes consistent with envelopes used to pay kickbacks to Confidential Source-1 and other customers at the Pharmacies. Law enforcement also recovered printed copies of pharmacists' licenses on special marble paper and an OTC point of sale machine. The identification number on the recovered OTC point of sale machine matched the machine used for transactions at the Pharmacies. From 19 Pharmacy, law enforcement recovered envelopes labeled with customer names and filled with cash and supermarket gift certificates. From ROK Pharmacy, law enforcement recovered stacks of supermarket gift certificates and envelopes labeled with customer names and containing supermarket gift certificates.

55. At ROK Pharmacy, law enforcement also recovered security camera footage from March 24, 2026. The security camera footage captured the defendant JIAN XIN HUANG bringing an OTC Card point of sale machine to ROK Pharmacy. XIUQIN HUANG also

was observed calculating how much in kickbacks was owed to a customer and providing the customer a corresponding colored paper ticket, supervising an employee charging OTC Cards for customers who did not appear to be present, and writing on envelopes similar to those used to pay kickbacks.

56. During the searches, law enforcement conducted a voluntary interview of the defendant XIUQIN HUANG. During the interview, XIUQIN HUANG admitted, in sum and substance, that ROK Pharmacy customers were given supermarket gift certificates for filling prescriptions and in exchange for the value on their OTC Cards. She further admitted that ROK Pharmacy used a "sticker" system to track which customers received supermarket gift certificates. Based on my training and experience and involvement in this case, I understood "stickers" to be referring to the tickets used throughout the Pharmacies to record kickbacks. XIUQIN HUANG also explained to law enforcement that she knew it was wrong to give patients supermarket gift certificates, and that she knew that paying customers for filling prescriptions was illegal.

57. During the execution of the Premises Warrant, law enforcement also conducted a voluntary interview of JIAN XIN HUANG. During the interview, JIAN XIN HUANG stated in sum and substance that he provided supermarket gift certificates to customers at QS Pharmacy several times a week and that he knew giving out such kickbacks was illegal.

58. Based on the foregoing, I respectfully submit that there is probable cause to arrest the defendants ZHANG HUANG, YANLE HUANG, JIAN XIN HUANG and XIUQIN HUANG for conspiracy to pay health care fraud kickbacks, in violation of Title 18, United States Code, Section 371.

WHEREFORE, your deponent respectfully requests that arrest warrants be issued for the defendants ZHANG HUANG, YANLE HUANG, JIAN JIN HUANG and XIUQIN HUANG so that they may be dealt with according to law.

IT IS FURTHER REQUESTED that, because public filing of this document at this time could result in a risk of flight by the defendants, as well as jeopardize the government's investigation, all papers submitted in support of this application, the complaint and arrest warrant, be sealed until further order of the Court.

LU TSZYAN-DAI Digitally signed by LU TSZYAN-DAI Date: 2026.09.29 13:04:20 -04'00'

LU TSZYAN-DAI
Special Agent, HHS-OIG

Sworn to me telephonically this
29th day of September, 2026

Clay H. Kaminsky
THE HONORABLE CLAY H. KAMINSKY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK